502 F.2d 461
 164 U.S.App.D.C. 1
 John E. MOSS et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent, Mobil Oil Corporation
et al.,Intervenors.
AMERICAN PUBLIC GAS ASSOCIATION et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent, Mobil Oil Corporation
and Associated GasDistributors, City of Chicago,
Intervenors.
AMOCO PRODUCTION COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Continental Oil
Company and Mobil OilCorporation, Intervenors.
 Nos. 72-1837, 72-1846, 72-1892.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Sept. 25, 1973.
Decided Aug. 15, 1974, Rehearing Denied Sept. 19, 1974.
 
 Morton L. Simons, Washington, D.C., with whom Barbara M. Simons, Washington, D.C., was on the brief for petitioners in Nos. 72-1837 and 72-1846.
 William H. Emerson, Tulsa, Okl., for petitioner in No. 72-1892.
 George W. McHenry, Jr., Acting Sol., Federal Power Commission, with whom Leo E. Forquer, Gen. Counsel, Michael J. Manning and Joan E. Heimbigner, Attys., Federal Power Commission, were on the brief for respondent.
 
 
 1
 Charles F. Wheatley, Jr., William T. Miller and Edward Berlin, Washington, D.C., were on the brief for petitioners in No. 72-1846.
 
 
 2
 Tom P. Hamill, Houston, Tex., Carroll L. Gilliam and Philip R. Ehrenkranz, Washington, D.C., were on the brief for intervenor, Mobil Oil Corp.
 
 
 3
 Peter H. Schuck and Marsha N. Cohen, Washington, D.C., were on the brief for intervenor, Consumers Union of United States, Inc.
 
 
 4
 Hamilton Treadway filed a brief as amicus curiae urging reversal.
 
 
 5
 Tom Burton, Houston, Tex., entered an appearance for intervenor, Continental Oil Co.
 
 
 6
 John E. Holtzinger, Jr., Washington, D.C., entered an appearance for intervenor, Associated Gas Distributors.
 
 
 7
 Richard A. Solomon, Washington, D.C., entered an appearance for intervenor, Public Service Commission, for the State of New York.
 
 
 8
 Before TAMM, MacKINNON and ROBB, Circuit Judges.
 
 ROBB, Circuit Judge:
 
 9
 The petitioners challenge a rule issued by the Federal Power Commission by Orders Nos. 455 and 455-A, pursuant to a rulemaking procedure in Commission Docket No. R-441.
 
 I.
 
 10
 The notice of proposed rulemaking in Docket No. R-441 proposed to amend the Commission's General Rules of Practice and Procedure by inserting a new 'Section 2.75 Optional Procedure for Certificating New Producer Sales of Natural Gas'. In the notice the Commission disclaimed any intention to supersede existing area rate procedures or decisions. The notice referred to the gap between the supply of natural gas and the demand, and the damaging impact of this shortage on the environment, economic growth, and costs to consumers. The proposed amendments to the Commission's rules were then set forth in full.
 
 
 11
 The proposed new Section 2.75 provided that 'applications for certification of future sales of natural gas produced within the United States may, at the option of the signatory parties to sales contracts, be submitted in accordance with the provision of this Section.' The proposal set up a procedure whereby the Commission would certificate new sales of natural gas under contracts executed on or after April 6, 1972. Under this procedure applications for certification of such new sales might be tendered by parties to a contract, and would 'be considered for permanent certification, either with or without pregranted abandonment, notwithstanding that the contract rate (might) be in excess of an area ceiling rate established in a prior opinion or order of this Commission.' The rates thus established would not be subject to change in later proceedings, and the certification would 'constitute a final determination, under Section 7 of the Natural Gas Act, that the rates and services therein specified are required by the present and future public convenience and necessity'. Deliveries could commence pending review of an application by the Commission and if the Commission had not entered its final order in six months the seller could charge the contract price.
 
 
 12
 The Commission called for written comments from any interested persons, and ninety-three written submittals were received. These included comments from independent producers, interstate pipeline companies, distribution companies, state regulatory agencies, other federal agencies, United States Senators and Congressmen, and trade and consumer organizations. Our petitioners were among those who submitted comments, objecting on grounds now asserted before us.
 
 
 13
 On August 3, 1972 the Commission issued Order No. 455, entitled 'Statement of Policy Relating to Optional Procedure for Certificating New Producer Sales of Natural Gas'. In its Statement the Commission reviewed 'data available to the Commission (that) indicates a worsening of the gap between natural gas demand and supply.' 'The assurance of adequate supplies of natural gas', said the Commission, 'can mitigate the damage being done to the nation's environment', and 'further aggravation of the gas supply problem also portends grave implications for the nation's economic objectives.' In light of these considerations the Commission concluded that:
 
 
 14
 Our responsibility to the consumers of natural gas, to assure reliable and adequate supplies at the lowest reasonable cost, impels us to that course of action best calculated to spur domestic exploration and development. To this end, we seek to provide two incentives to domestic production, both fully congruous with consumer protection. First, we will certificate sales of gas not previously deliverable to the interstate market at prices which are shown to be in the public interest. Second, to the extent possible, we will lessen rate uncertainty which has prevailed since the early 1960's.
 
 
 15
 The Commission emphasized that its policy statement and the optional procedures established were 'directed at supplies of gas not available to the interstate market prior to April 6, 1972': that 'consumers will not pay higher rates except for new supplies, and then only to that extent that the contracting parties establish on the record that the price to be paid is required by the public interest.' The Commission said that domestic gas exploration and development were impeded by rate uncertainty, since 'there is no assurance at the present time that a producer may not ultimately have to refund some of an initial rate based on a just an reasonable determination and upon which the producer relied when it dedicated a new gas supply to the interstate market.' Recognizing 'the supremacy of Section 5' of the Natural Gas Act, 'that Section 5 . . . prevents the Commission from granting sanctity of contract' and that it could not 'bind a future Commission not to invoke the prospective operation of Section 5' the Commission announced its 'policy to examine the justness and reasonableness of proposed rates in Section 7 proceedings instituted under this Section, thus avoiding the uncertainty of reserving rate determinations for subsequent Section 4 or Section 5 action.' With this preface the Commission promulgated the new Section 2.75 of its Rules of Practice and Procedure, General Policy and Interpretations. We reproduce the Rule in full in the appendix, and we shall examine in particular the provisions on which the petitioners center their attack.
 
 
 16
 On applications for rehearing and a motion for stay of its Order No. 455 the Commission on September 8, 1972 issued Order No. 455-A entitled 'Order Clarifying Order, and Denying Applications for Rehearing and Stay'.
 
 
 17
 In this court the petitioners, except for the petitioner Amoco Production Company, contend that the optional procedure of Section 2.75 is a method of deregulating natural gas by certifying contract rates, without regard to the standards of Sections 4 and 5 of the Act. They attack the findings of the Commission that the shortage of natural gas requires the new program and justifies its estimated costs; and they argue that they were entitled to an evidentiary hearing on this matter. They challenge the provision of the new rule that the Commission may review and by on decision at the outset approve both an initial price and fixed rate escalations provided in the sales contract for future periods. They also challenge as 'contrary to the consumer-protection objectives of the Natural Gas Act' the provision of the new rule that if the Commission has not acted on an application within six months a producer may collect contract rates without liability to refund. Finally, they contend that the Natural Gas Act prohibits pregrnated abandonment, which the new rule would authorize.
 
 
 18
 Amoco Production Corporation (Amoco) argues that the Commission by its Orders Nos. 455 and 455-A has established rates without an adequate record or an opportunity for hearing. In addition, Amoco challenges the requirements that producers waive contingent escalations and that indefinite pricing clauses be excluded from their contracts.
 
 
 19
 The intervenor Mobil Oil Corporation supports the Commission's orders and urges that the petitions for review be denied.[1]
 
 II.
 
 20
 The Commission's order is premised on its finding of a shortage of available domestic gas reserves. Although the petitioners question this premise we cannot reject the Commission's finding. The existence of a shortage of natural gas has been recognized by the Supreme Court and by this court. See F.P.C. v. Louisiana Power & Light Co., 406 U.S. 621, 626, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972); City of Chicago v. F.P.C., 147 U.S.App.D.C. 312, 458 F.2d 731 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); Public Service Commission of N.Y. v. F.P.C., 151 U.S.App.D.C. 307, 467 F.2d 361 (1972). As the Commission said in Order No. 455-A the petitioners' argument ignores 'the curtailments of firm gas customers by seven major interstate pipelines during the 1971-1972 heating season. Twenty-eight pipelines have now filed curtailment plans. Firm requirement deficiencies during the 1972-1973 heating season are expected to be even more severe. In other words, new customers are being denied gas service and the service to existing customers is being reduced. The salient fact is that there is a shortage in deliverable gas reserves contrary to the national interest.'
 
 
 21
 Since this was a rulemaking proceeding in which all interested persons were afforded an opportunity to make their views known by written comments, in accordance with Section 4 of the Administrative Procedure Act,5 U.S.C. 553, a formal evidentiary hearing was not necessary. United States v. Florida East Coast Rwy. Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); City of Chicago v. F.P.C., 147 U.S.App.D.C. 312, 458 F.2d 731 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); American Public Gas Association v. F.P.C., 162 U.S.App.D.C. , 498 F.2d 718 (1974). The Commission was entitled to act, as it did, on the data available to it and from other proceedings before the Commission, and the information furnished in the comments submitted.
 
 III.
 
 22
 The petitioners contend that the Commission by its new rule has attempted to substitute contract prices negotiated between producers and pipelines for established just and reasonable rates-- in other words, the petitioners say that contract rates will be automatically approved. If this were the meaning and effect of the Commission's Order it would of course be invalid, for 'just and reasonable' rates may not be determined solely and conclusively upon the basis of market or contract prices. F.P.C. v. Texaco, Inc., 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974); F.P.C. v. Sunray DX Oil Co., 391 U.S. 9, 25, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968). Equally true however is that the contract or market price of gas may be taken into account, along with other non-cost factors, in the setting of just and reasonable rates. Thus under both Section 4 and Section 7 of the Act the Commission properly proposed to consider economic and market conditions, the adequacy of allowances for exploration and development, and the inadequacy of the supply of natural gas. F.P.C. v. Texaco, Inc., supra; Permian Basin Area Rate Cases, 390 U.S. 747, 793-795, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Atlantic Refining Co. v. Public Service Commission, 360 U.S. 378, 391, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959); Southern La. Area Rate Cases (Austral Oil Co. v. F.P.C.), 428 F.2d 407, 441 (5th Cir.), cert. denied, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970).
 
 
 23
 A respectable argument can be made that Section 2.75 on its face fails to disclose with sufficient clarity the purpose and determination of the Commission, in issuing certificates thereunder, to consider all factors-- including producers' costs-- relevant to the fixing of just and reasonable rates. The Rule itself is ambiguous. It fails to specify the factors the Commission will consider in deciding whether contract rates are just and reasonable, and it is open to the construction that contract rates will be certified automatically as just and reasonable. Cf., F.P.C. v. Texaco, Inc., supra. We think however that the rule must be interpreted in the context of the gloss placed upon it by the Commission in Orders Nos. 455 and 455-A, and when it is so interpreted we are convinced that it can be sustained.
 
 
 24
 As we have said the Commission in Order No. 455 announced its 'policy to examine the justness and reasonableness of proposed rates in Section 7 proceedings instituted under this Section, thus avoiding the uncertainty of reserving rate determinations for subsequent Section 4 or Section 5 action.' In its examination of proposed rates, said the Commission, 'each contract filed under the alternative procedure must be considered on the merits of the terms and provisions within each contract. There certainly must be some evidentiary basis proffered by the seller-applicant upon which we can judge whether the contract rate is just and reasonable. We will, absent a showing of special circumstance, accept as conclusive the cost findings embodied in our area rate decisions, as such may be supplemented from time to time by appropriate Commission order.' Thus, the Commission's review will include consideration of costs; and since all applications are subject to notice, intervention and hearings, all parties are free, upon a 'showing of special circumstances' to challenge the cost findings embodied in area rate decisions.
 
 
 25
 In Order No. 455-A, clarifying Order No. 455, the Commission pointed out that no rates were prescribed by Order No. 455 and asserted that 'individual hearings will be held on each certificate application so filed at which time any interested party, including petitioners, may intervene and present evidence.' Responding to the charge that by issuing Order No. 455 'we have deregulated natural gas producers' the Commission said:
 
 
 26
 Contrary to the 'Concerned Congressmen's' contention, this procedure is not without standards. Certification will be subject to the standards of 'just and reasonable' in Section 4 and 'present and future public convenience and necessity' of Section 7. We will apply those standards of the Natural Gas Act as interpreted by the courts. In other words, only after a hearing, and Commission findings, subject to Section 4 and 7, will such a certificate be granted. This is not decontrol. Section 2.75 1 specifically states that the rates, charges and services to be certificated under the optional procedure shall be just and reasonable and required by the present and future public convenience and necessity. In other words, such certification shall conform to the standards of Sections 4 and 7 of the Natural Gas Act.
 
 
 27
 We agree with the Commission that when considered and construed in the light of these positive statements the Commission's Rule does not abandon the standards of Section 4 of the Act, and we have previously noted the Commission's recognition that Section 5(a) of the Act will remain applicable to all rates. Atlantic Refining Co. v. Public Service Commission, (CATCO), 360 U.S. 378, 391, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959); Permian Basin Area Rate Cases, supra; Austral Oil Co. v. F.P.C., supra. What the Commission proposes is to combine proceedings under Sections 4 and 7. In the single combined proceeding, says the Commission, the substantive standards of both Sections 4 and 7, as established by the courts, will be applied to the evidence produced by the applicant. If in weighing the evidence the Commission violates those substantive standards, the aggrieved party will have a remedy in the courts. On the present record, however, we must assume that the Commission will abide by the standards of the statute and the promises it has made. We cannot condemn the Commission on the theory that it may not do what it has promised to do.
 
 IV.
 
 28
 Section 2.75 provides that the Commission may review and by one decision at the outset approve both an initial price and fixed rate escalations provided in the sales contract for future periods. The petitioners contend that review of fixed price escalations during the certificate proceedings, in advance of their effective date, violates Sections 4(d) and 4(e) of the Act, 15 U.S.C. 717c(d) and 717c(e) which provide in pertinent part:
 
 
 29
 Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public.
 
 
 30
 Whenever any such new schedule is filed the Commission shall have authority, . . . to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, . . . may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect . . ..
 
 
 31
 In Order No. 455-A the Commission commented on its provision for advance approval of contract rate escalations.
 
 
 32
 We have also been asked to clarify whether or not contract escalations approved by the Commission in a Section 2.75 proceeding would be self-operative or whether such would necessarily be subject to rate change filings under Section 4(e) of the Natural Gas Act. We believe that this inquiry is answered by episcopal Theological Seminary of the Southwest v. F.P.C. (106 U.S.App.D.C. 37), 269 F.2d 228 (CADC), cert. denied sub nom., Pan American Petroleum Corp. v. F.P.C., 361 U.S. 895 (80 S.Ct. 197, 4 L.Ed.2d 151) (1959), wherein it was held that no rate change could become effective without a 4(e) filing. This is not to say, however, that the Commission recedes from the basic position expressed in Order No. 455 that it intends to grant sanctity of contract to the full extent that the Commission can, absent amendment of the Natural Gas Act by Congress. It is our intention to consider applications under Section 2.75 and make a one time determination of the public convenience and necessity aspects of the certificate application and the justness and reasonableness of the rates therein proposed, both as to initial rates and as to definite escalations which might be embodied in the contract. For future definite escalations to become effective without a 4(e) filing will require amendment of the Natural Gas Act, through legislation such as that now pending before Congress.
 
 
 33
 Thus, the seller-applicant will be required to make a change in rate filing with the Commission at the time any escalation is scheduled to take effect. The Commission and the public will be placed on notice that the escalation is about to become effective, and the provisions of Section 4(e) will come into play. The Commission may also invoke Section 5 to investigate any rates, charges, or terms of service contained in the contract; and any rates which appear to be unreasonable may be reduced in proceedings under Section 5(a).
 
 
 34
 According to the petitioners it is impossible for the Commission, in advance, to determine the 'reasonableness' of future rate escalations in Section 4 proceedings.
 
 
 35
 In area rate proceedings the Commission may impose a moratorium or ceiling, setting a just and reasonable rate that will obtain for a number of years. Permian Basin Area Rate Cases, supra; Southern Louisiana Area Rate Cases, supra. Such ceilings are imposed on the basis of projections of future conditions. Here, we have fixed escalations in contract rates, based upon applicants' projections of conditions over the life of a contract. The Commission will consider the escalations against its own projections and may of course modify the proposed rate increases. Section 2.75 provides a procedure for this consideration under Section 4 of the Act. Any increases initially approved remain subject to review in future proceedings under Section 4(e) and Section 5(a). We conclude that this procedure does not violate the Act.
 
 
 36
 We cannot say as an abstract proposition of law that it is impossible for the Commission to make an advance determination of 'reasonableness' in proceedings under Section 4. Although as a practical matter one may be skeptical about the ability of the Commission to succeed in this endeavor, we think it may make the attempt. Whether it succeeds will depend upon the evidentiary basis for the escalations proposed in a given contract and the reasonableness of Commission findings and projections supporting and approving such escalations. The question is one of proof which can be answered only on a record setting out a particular proposal and the evidence supporting it.
 
 V.
 
 37
 The new Section 2.75 provides in paragraph (o) that upon filing an application for certification a seller may commence deliveries 'at rates no higher than the prevailing area ceiling rate', and may continue such deliveries for six months unless the commission at an earlier date enters its final order on the application. If the Commission does not issue its final order within six months the seller, upon filing a notice of change in rate, may collect the contract rate, without refund obligation, and may continue to collect the contract rate until the Commission takes final action.
 
 
 38
 The petitioners contend that (1) the Commission may not permit the contract rates to go into effect before the completion of the certificate proceedings, and (2) any rate above the area rate which is charged before it is determined to be just and reasonable must be subject to refund. We are not persuaded by the petitioners' contentions.
 
 
 39
 When Section 2.75(o) is examined in the context of the applicable provisions of the Act and the Commission's rulemaking authority under Section 16 it will be seen that the effect of the Rule is this:
 
 
 40
 (1) When an applicant files for certification of a sale at a rate above the area rate he will be granted a temporary certificate to sell at the applicable area rate, with the condition under Section 7(e) that he not file for an increase for six months, if a permanent certificate is not issued within that period;
 
 
 41
 (2) If a permanent certificate is not issued within six months the producers may file for a rate increase up to the contract rate under Section 4(d); and
 
 
 42
 (3) Upon such filing the Commission will exercise its discretion under Section 4(e) not to suspend the increase and not to order refunds if the just and reasonable rate is later determined to be lower than the contract rate. We think these procedures are within the Commission's statutory authority.
 
 
 43
 pending the issuance of a permanent certificate the Commission under Section 7(e) of the Act may issue a temporary certificate containing such reasonable terms and conditions as the public convenience and necessity may require. Atlantic Refining Co. v. Public Service Commission (CATCO),supra, 360 U.S. at 391, 79 S.Ct. 1246; F.P.C. v. Hunt, 376 U.S. 515, 520-521, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964). There can be no question therefore that the Commission may issue temporary authorizations to permit deliveries at area rate ceilings pending final action on applications; and the Commission is not bound to order refunds of rates collected on an interim basis under a temporary authorization issued under Section 7, even if the final order upon a certificate application contains a finding that a lower rate must be collected prospectively. Public Service Commission of N.Y. v. F.P.C., 117 U.S.App.D.C. 287, 329 F.2d 242, cert. denied, 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735 (1964); Continental Oil Co. v. F.P.C., 378 F.2d 510, 532 (5th Cir. 1967).
 
 
 44
 Section 4(e) provides only that refunds 'may' be ordered and the Commission has discretion to find that the objectives of the Act may not require refunds. Hugoton-Anadarko Area Rate Case, 466 F.2d 974, 990-991 (9th Cir. 1972). Moreover, the Commission may order refunds under Section 4(e) only after suspension, Mobile Gas Service Corp. v. F.P.C., 215 F.2d 883 (3rd Cir. 1954), aff'd sub nom., United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); and refusal to suspend a filed rate is a nonreviewable exercise of the agency's discretion. Arrow Transportation Co. v. Southern Ry., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963); Municipal Light Boards of Reading and Wakefield, Mass. v. F.P.C., 146 U.S.App.D.C. 294, 304, 450 F.2d 1341, 1351 (1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972). Since the Commission in the exercise of its nonreviewable discretion has decided that it will not suspend the applicants' contract rates we think it must follow that it may lawfully refuse to require refunds.
 
 VI.
 
 45
 Section 2.75 provides that by accepting a certificate under the optional procedure the seller-applicant unconditionally agrees to waive all rights to contingent adjustment of flowing gas rates as provided by the Commission in area rate decisions (Southern Louisiana II and Texas Gulf Coast) for flowing gas which the seller-applicant produces in the same geographical pricing area as the pricing area of the production covered by the application.
 
 
 46
 Amoco attacks the waiver requirement upon the grounds that (1) no interrelationship exists between area rate orders and applications for certification under the new procedures and (2) the differences in rate treatment create a discriminatory preference. Amoco says 'The new gas incentive that is the objective of Order No. 455 will be greater in producing regions other than Southern Louisiana and the Texas Gulf Coast that are not affected by this waiver requirement. Pipeline companies and consumers of gas are affected in that some may be forced to pay higher prices for gas certificated under Order No. 455 because such prices must overcome the economic effect of waiver of contingent escalations in area rates covering gas sold to others.' We think these arguments must fail.
 
 
 47
 The Commission's explanation satisfies us that the provisions of the challenged paragraph are reasonable. The Commission said:
 
 
 48
 Our reasons for imposing the conditions (of the paragraph) . . . are two-fold: First contingent escalations are a component of area rates. Flowing and new gas prices were established in Southern Louisiana and Texas Gulf Coast with due regard to the incentives which these escalations provided.
 
 
 49
 . . . .hic
 
 
 50
 Secondly, but of equal importance, we offer the procedures herein adopted as an optional procedure to function in parallel with area rate regulation. Were we to cast aside the waiver required in (the) paragraph . . ., consumers would be injured, and producers in Southern Louisiana and in Texas Gulf Coast (the only producers affected by this waiver) would be afforded an unfair position over producers in all other areas. Such unacceptable results would occur because applications under this Section would operate, in the absence of with flowing gas in Southern on new gas sales but would also operate to escalate old gas prices as well.
 
 
 51
 By retaining (the) paragraph . . . we require, in effect, an election by producers with flowing gas in Southern Louisiana and Texas Gulf Coast; they must choose whether contingent escalations on flowing gas provide a sufficient incentive to seek and sell new gas to the interstate market, at area rates, or whether a greater degree of market freedom in the pricing of new supplies offsets the benefit of contingent escalation of flowing gas prices. Requiring this election protects the consumer, as we must, from escalation of both flowing and new gas rates.
 
 
 52
 We cannot, in equity, permit a producer with flowing gas in Suthern Louisiana or Texas Gulf to achieve higher-than-area rate prices for its own new deliveries and still receive price escalations on its flowing gas through the efforts of other producers who elect to remain on area rate pricing for new dedications.
 
 
 53
 Thus, the Commission points out that the contingent escalation provisions are integral parts of the area rate orders, offering incentives to encourage producers to explore for and develop additional supplies of gas. If no additional supplies are developed then the contingent escalations do not become effective. The Commission's new rule provides different incentives to encourage exploration, development and immediate dedication of gas to the interstate market. The rule does not supersede the area rate orders but gives the producer a choice: he may dedicate his new gas under the procedure that is most beneficial to him. If he elects to file under the new procedure it is reasonable to provide that he may not enjoy the contingent escalations provided in the area rate orders. He may benefit under one procedure but not under both.
 
 VII.
 
 54
 Section 2.75 provides that with certain exceptions contracts including any type of indefinte pricing clause will not be accepted for filing. Explaining this provision the Commission said, in Order No. 455:
 
 
 55
 We have determined that so-called 'area rate clauses' should not be allowed because area ceiling rates might then become a floor for all future contracts to be certificated under the optional procedure. Further, redetermination and renegotiation clauses will not be permitted because rates under the optional procedure would, perforce, be continually changing. Other types of clauses should be allowed, and, therefore, the following language is adopted.
 
 
 56
 No contract shall be accepted for filing if it includes any type of indefinite pricing clause except Btu price adjustment clauses, clauses to reflect changes in state production taxes, and clauses allowing for the recovery of compression and dehydration charges. Indefinite pricing clauses shall include, but are not limited to 'area rate or FPC clauses', a 'price redetermination or renegotiation clause' or a 'special escalation clause.'
 
 
 57
 Amoco argues that this prohibition is arbitrary and is an invalid repeal of Section 154.93 of the Commission's Rules and Regulations. Section 154.93, 18 C.F.R., Subchapter E, Part 154, describes the type of price change provisions which may appear in a rate schedule to be certificated by the Commission.
 
 
 58
 We think the Commission's prohibition must be sustained.
 
 
 59
 If the new rule repeals or modifies Section 154.93 this action is a proper exercise of the Commission's authority to amend its regulations as it deems necessary and appropriate. Nor can we say that the action was arbitrary. The Commission may of course make rules prohibiting certain pricing clauses in contracts to be certificated, Texaco v. F.P.C., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); and the Commission has consistently held that indefinite pricing clauses are contrary to the public interest. see pure Oil Co., 25 F.P.C. 383 (1961), aff'd Pure Oil Co. v. F.P.C., 299 F.2d 370 (7th Cir. 1962).
 
 
 60
 Here the Commission is endeavoring to provide the producers with some measure of price certainty and stability. To accomplish that end the Commission offers an optional procedure under which producers may elect not to adhere to area price ceilings. It is reasonable to make the 'area rate' clauses unavailable to a producer who by exercising this option elects not to adhere to the area ceilings. As the Commission explained in Order No. 455-A:
 
 
 61
 . . . We are particularly urged to permit the inclusion of so-called 'FPC clauses' or 'area rate clauses' in contracts tendered for certification under Section 2.75.
 
 
 62
 If we did not intend to afford sanctity of contract to the fullest extent available to this Commission, we would be inclined toward sympathy with the producers' view. However, we think it inappropriate for us to sanctify a contract in the sense of guaranteeing that the price will not go down but deny the reciprocal sanctity that a certificated contract price will not rise.
 
 VIII.
 
 63
 We come finally to the provision of the new Section 2.75(e) providing:
 
 
 64
 Applications presented hereunder will be considered for permanent certification, either with or without pregranted abandonment, notwithstanding that the contract rate may be in excess of an area ceiling rate established in a prior opinion or order of this Commission.
 
 
 65
 The petitioners contend that this provision violates Section 7(b) of the Act, 15 U.S.C. 717f(b) which provides:
 
 
 66
 No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment. We think the petitioners are right.
 
 
 67
 Pregranted abandonment would leave a producer free to discontinue service to the interstate market, perhaps years after the original certification, with no contemporaneous obligation on the producer to justify withdrawal of service as consistent with the public convenience and necessity. We think Section 7(b) does not contemplate or authorize such procedure.
 
 
 68
 Attempting to justify its provision for pregranted abandonment the Commission says only, in Order No. 455-A, 'Certainly, when an application for pregranted abandonment is before it for determination as to its certification, the Commission may make the necessary findings required by section 7(b) of the Act.' We find this conclusory assertion unpersuasive. We have expressed skepticism as to the ability of the Commission to make advance determination of the reasonableness of price escalations, but we have explained that the Commission may be able to do so upon the basis of projections of conditions over the life of a contract, and subject to future proceedings under Sections 4(e) and 5(a) of the Act. It appears to us however that pregranted abandonment requires more clairvoyance than even the Commission's expertise reasonably encompasses. Furthermore, abandonment will not be subject to future review but will be completely untrammeled.
 
 
 69
 We are fortified in our conclusion by Sunray Oil Co. v. F.P.C., 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960). In that case the Supreme Court rejected the contention that the Commission lacked authority to grant a permanent certificate when one of limited duration had been applied for. The Court said:
 
 
 70
 If petitioner's contentions . . . were to be sustained, the way would be clear for every independent producer of natural gas to seek certification only for the limited period of its initial contract with the transmission company, and thus automatically be free at a future date, untrammeled by Commission regulation, to reassess whether it desired to continue serving the interstate market.
 
 
 71
 364 U.S. 142, 80 S.Ct. 1396.
 
 
 72
 The Commission's proposal for pregranted abandonment would have the same effect as the proposition contended for in the Sunray case, with the same potentiality of prejudice to consumers which the supreme Court pointed out in that case.
 
 
 73
 We conclude that Section 2.75(e) of the Commission's Rule is unlawful and must be set aside. In all other respects the Commission's orders are affirmed.
 
 
 74
 So ordered.
 
 APPENDIX
 
 75
 The Commission, acting pursuant to the provisions of the Natural Gas Act, as amended, particularly Sections 4, 5, 7 and 16 thereof (52 Stat. 822, 823, 824, 825 and 830; 56 Stat. 83, 84; 61 Stat. 459; 76 Stat. 72, 15 U.S.C. 717c, 717d, 717f, and 717o) orders:
 
 
 76
 (A) Part 2 of the Commission's General Rules of Practice and Procedure, General Policy and Interpretations, Subchapter A, Chapter I, Title 18 of the Code of Federal Regulations is amended by adding new Section 2.75, as follows:
 
 
 77
 2.75 Optional Procedure for Certificating New Producer Sales of Natural Gas
 
 
 78
 a. Notwithstanding any other provisions in the General Rules of Practice and Procedure of the Federal Power Commission, or the Regulations Under the Natural Gas Act of the Federal Power Commission, applications for certification of future sales of natural gas produced within the United States may, at the option of the signatory parties to sales contracts, be submitted in accordance with the provisions of this Section. To the extent that any Federal Power Commission General Rules of Practice and Procedure or Regulations under the Natural Gas Act are inconsistent herewith, the same are hereby amended to permit the optional procedure herein set forth.
 
 
 79
 b. The provisions of this Section shall be available if each of the following conditions exists:
 
 
 80
 1. A contract covering the sale of natural gas in interstate commerce has been executed for gas produced from a well or wells commenced after April 6, 1972; or a contract covering the sale of natural gas in interstate commerce has been executed for gas not previously sold in interstate commerce except under the provisions of Orders 402, 418 or 431 issued May 6, and December 10, 1970; April 15, 1971, respectively.
 
 
 81
 2. All parties whose gas is to be sold under the terms and conditions of such contract, except for the royalty interest therein, must agree to the submission of the same for certification in accord with the provision of this Section.
 
 
 82
 3. The purchaser under such contract is a jurisdictional pipeline.
 
 
 83
 4. The seller under such contract established that he has discharged, or is prepared by plan or program to discharge, refund obligations (in the geographical pricing area in which the seller would commit gas under such contract,) prescribed by prior orders or opinion of this Commission. It is provided, however, that any such seller may make the showing here required without prejudice to his claim in any case now pending on judicial review that such obligations were unlawfully imposed by the Commission. (Bracketed language added by Order No. 455-A, September 8, 1972, 37 Fed.Reg. 18723.)
 
 
 84
 5. The gas covered by the contract offered for certification is produced from a well or wells commenced on or after April 6, 1972; or the gas offered for certification has not been previously sold in the interstate market (unless abandonment has been previously granted or a sale was made under Orders 402, 418 or 431), nor has an application been previously filed with the Commission for certification of the sale of such gas, except for an emergency sale under Orders 402, 418 or 431.
 
 
 85
 c. If all of foregoing conditions precedent exist, the parties to the contract may tender the same to the Commission and request the issuance of a certificate of public convenience and necessity to the seller for sales of natural gas thereunder. Each party to the application shall certify to his portion that all parties to the contract, except those having a royalty interest only, desire certification in accordance with the terms and provisions of this Section, that the seller expressly agrees to the waivers and elections hereinafter provided for in sub-sections mand o of this Section, and that all conditions precedent as set forth in sub-section b of this Section are met.
 
 
 86
 d. A certificate of public convenience and necessity issued and accepted under this Section shall not be subject to change by determinations or orders whether heretofore made or hereafter to be made in producer or pipeline rate proceedings initiated under Section 4 of the Sct, and orders issued hereunder shall not constitute establishment of an area rate; provided, however, that nothing herein shall limit the applicability of Section 5 of the Natural Gas Act. Nothing done hereunder shall be recognized by the Commission as triggering any existing contract escalation clauses.
 
 
 87
 e. Applications presented, hereunder will be considered for permanent certification, either with or without pregranted abandonment, notwithstanding that the contract rate may be in excess of an area ceiling rate established in a prior opinion or order of this Commission.
 
 
 88
 f. No contract shall be accepted for filing if it includes any type of indefinite pricing clause except Btu price adjustment clauses, clauses to reflect changes in state production taxes, and clauses allowing for the recovery of compression and dehydration charges. Indefinite pricing clauses shall include, but are not limited to 'area rate or FPC clauses', a 'price redetermination or renegotiation clause' or a 'special escalation clause.'
 
 
 89
 g. A seller-applicant under this Section shall state the ground for claiming that the present or future public convenience and necessity require issuance of a certificate on the terms proposed in the application, and shall provide factual support for such claims. The application shall contain a contract summary as prescribed in Sec. 250.5 of our Regulations Under the Natural Gas Act.
 
 
 90
 h. The purchaser under a contract filed under this Section shall certify that the present or future public convenience and necessity require issuance of a certificate to the seller, and shall provide information in support of such certification with respect to the purchaser's (1) system-wide supply, (2) present and estimated 3-year peak day and average day demands, (3) present and estimated 3-year requirements of customers on its system, (4) deliverability life, (5) implementation, if any of curtailment plans, (6) emergency purchases of gas under Order 431, or 157.22 or 157.29 of these Regulations, and (7) purchases of LNG or attachment of other supplemental supplies.
 
 
 91
 i. The information required by sub-section g. and h. may be submitted by cross-reference and incorporation of information already on file with the Commission.
 
 
 92
 j. Applications requesting issuance of certificates of public convenience and necessity as authorized in this Section shall be processed in accordance with the procedural requirements, including those relating to notice, intervention and hearing, set out in Part 157 of the Commission's Regulations Under the Natural Gas Act.
 
 
 93
 k. Pursuant to the authority contained in and subject to the jurisdiction conferred upon the Federal Power Commission by Sections 7 and 15 of the Natural Gas Act and the Commission's Rules of Practice and Procedure, a statutory hearing will be held before the Commission without further notice on all applications for certificates under this Section in which no petition to intervene in opposition is filed within the time required, if the Commission on its own review of the matter believes that a grant of a certificate is required by the public convenience and necessity. Where the Commission believes that a formal hearing is required notice of such hearing will be duly given.
 
 
 94
 l. A final order of this Commission, issuing a certificate as applied for, or issuing a conditioned certificate acceptable to the applicants, shall constitute a final determination that the rates, charges and services therein specified are just, reasonable and required by the present and future public convenience and necessity.
 
 
 95
 m. By acceptance of a certificate issued hereunder, the seller-applicant unconditionally agrees to (1) waive all rights to seek future rate increases under Section 4 of the Natural Gas Act with respect to the contract submitted, other than price escalations, if any, as certificated by the Commission; and (2) waive all rights to contingent adjustment of flowing gas rates as provided by the Commission in area rate decisions heretofore decided, for flowing gas which the seller-applicant produces in the same geographical pricing area as the pricing area of the production covered by the application made under this Section.
 
 
 96
 n. Upon the filing of an application under this Section, deliveries pursuant to the provisions of the tendered contract may be commenced, pending review of such application by the Commission. Notice of commencement of deliveries shall be given to the Commission within ten days after deliveries first commence, and shall include all pertinent information concerning the deliveries. Any such deliveries so commenced may be terminated (1) if such contract for any reason shall terminate or be terminated prior to the issuance by the Commission of a final order upon review of such application, or (2) upon the issuance of a certificate containing conditions unacceptable to the party adversely affected. If the Commission by final order shall deny such application, or if the party or parties to the contract adversely affected shall not accept the terms and conditions prescribed by the Commission, deliveries thereunder shall be terminated. Within thirty days after termination of deliveries, the seller shall notify the Commission of such termination, and shall report the date of termination, volumes delivered, and revenues received.
 
 
 97
 o. If the parties elect to commence deliveries as set forth in subsection n., such deliveries will be made at rates no higher than the prevailing area ceiling rate and shall so continue for six months unless the Commission has made its final orders on the application at an earlier date; at the end of such six-month period (if the Commission has not made its final order), the seller upon the filing of a notice of change in rate pursuant to Section 154.94 of the Commission's Regulations shall be entitled to receive without refund obligation and the purchaser shall be entitled to pay, the rates specified in the contract, and such contract rates shall continue as the effective rates until the Commission enters its final order on the certificate application.
 
 
 98
 (B) The amendment provided for herein shall be effective as of the date of issuance of this order.
 
 
 99
 (C) The Secretary of the Commission shall cause prompt publication of this order to be made in the Federal Register.
 
 
 100
 By the Commission.
 
 
 101
 MARY B. KIDD, Acting Secretary.
 
 
 102
 (seal)
 
 
 
 [1]
 Hamilton Treadway, Esquire, filed a brief amicus curiae contending that the orders are invalid because (1) no hearing was held by the Commission and the orders are based on inadequate statements of fact and questionable conclusions; (2) the Commission failed to comply with the requirements of the National Environmental Policy Act; and (3) the Commission's orders are a step in the process of deregualtion. We are not persuaded by these arguments