510 F.2d 656
 166 U.S.App.D.C. 276, 5 P.U.R.4th 500
 CONSUMERS UNION OF UNITED STATES, INC., Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Tenneco Oil Company, et al., Intervenors.
PUBLIC SERVICE COMMISSION OF the STATE OF NEW YORK, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Exxon Corporation et al., Intervenors.
AMERICAN PUBLIC GAS ASSOCIATION, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Public Service Commission of the State of New York et al.,
Intervenors.
 Nos. 73--1792, 73--1817 and 73--1834.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 4, 1974.
Decided Oct. 7, 1974.
Rehearing Denied in No. 73--1792
Jan. 13, 1975.
 
 Peter H. Schuck, Washington, D.C., for petitioner in No. 73--1792 and intervenor Consumers Union of the United States, Inc.
 Richard A. Solomon, Washington, D.C., with whom Peter H. Schiff, Gen. Counsel, Public Service Commission of the State of New York, Albany, N.Y., was on the brief, for petitioners in No. 73--1817 and intervenor Public Service Commission of the State of New York.
 John Staffier, Atty. F.P.C., for respondent. Leo E. Forquer, Gen. Counsel, F.P.C., George W. McHenry, Jr., Sol., and John H. Burnes, Jr., Atty. F.P.C., were on the brief, for respondent.
 
 
 1
 J. Evans Attwell, Houston, Tex., for intervenor Belco Petroleum Corp., Agent for Belco 1971 Oil and Gas Fund, LTD.
 
 
 2
 Kirk W. Weinert, Houston, Tex., with whom C. Fielding Early, Jr., Houston, Tex., was on the brief, for intervenor Texaco, Inc.
 
 
 3
 R. Gordon Gooch, Houston, Tex., with whom Jeron L. Stevens, Houston, Tex., was on the brief, for intervenor Tenneco Oil Co.
 
 
 4
 Charles F. Wheatley, Jr., and William T. Miller, Washington, D.C., were on the brief for petitioners in No. 73--1834.
 
 
 5
 Harry S. Littman, Washington, D.C., entered an appearance for intervenor Tennessee Gas Pipeline Co.
 
 
 6
 John H. Cooper, Jr., Houston, Tex., entered an appearance for intervenor Exxon Corp.
 
 
 7
 Edward W. Stern, Philadelphia, Pa., entered an appearance for intervenor, Philadelphia Gas Works.
 
 
 8
 Before BAZELON, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.
 
 BAZELON, Chief Judge:
 
 9
 This is the first appeal from a decision of the FPC acting under section 2.75 of its regulations, which establishes a procedure for certification of new sales of natural gas "notwithstanding that the contract rate (might) be in excess of an area ceiling rate established in a prior opinion or order of this Commission."[1] In Moss v. FPC,[2] we upheld the basic validity of section 2.75, but we did not define the permissible conditions of its application. In this case, we must consider the character and quantum of proof needed in the certification of contract rates under the optional procedure.
 
 
 10
 In this proceeding, the FPC considered the rate provisions of contracts between three producers (Belco, Tenneco and Texaco) and the Tennessee Gas Pipeline Co. The contracts provide for the sale of gas produced from wells recently drilled in the offshore Louisiana area. The FPC approved as 'just and reasonable' the basic rate of 45 cents per Mcf provided for in each contract as well as certain yearly escalation features.[3] The area rate presently applicable for 'new gas' is 26 cents per Mcf.[4]
 
 
 11
 There are serious weaknesses in the Commission's justification for this nearly sixty percent increase over the area rates, which were established as recently as 1971. These weaknesses appear both in the way in which the Commission calculated the costs of producing the gas and in the weight which the Commission accorded non-cost considerations.
 
 
 12
 The staff's cost presentation, on which the Commission relied partially, sought to estimate the current costs of producing new gas. The staff utilized the methodology consistently employed by the Commission in its area rate decisions, combining information from a number of sources to establish the national cost of finding and producing new gas.[5] There is some question initially whether reliance on nationwide data is consistent with the 'supply project' approach adopted by the Commission in its opinion, an approach whereby it seeks to ensure that 'gas consumers are receiving the lowest cost available increment of supply.'[6] FPC Chairman Nassikas, dissenting in part, thought that the 'supply project approach' required reference to 'actual unit costs . . . or . . . individual project costs.'[7] A decision requiring the Commission to rely on individualized cost data, however, would have to be reconciled with this court's opinion in Moss, which approved, by implication, the Commission's avowed intent to rely on "cost findings embodied in our area rate decisions."[8] And in any event, another more obvious problem with the Commission's cost analysis makes it unnecessary to reach this issue.
 
 
 13
 In its final estimate of production costs, the Commission made use of 1971 as a 'test year' in determining productivity--the average number of Mcf added to available reserves per each foot drilled. The Commission's staff followed the practice, well-established in area rate-making proceedings, of using productivity figures averaged over a period of years. The low end of its cost estimate was based on average productivity over the last 15 to 25 years, and the upper limit of its analysis was based on average productivity between 1967 and 1971. Its calculations yielded a cost range of 28 to 36 cents per Mcf.
 
 
 14
 The Commission adopted the staff's upper limit as the basis of the lower limit of its estimate.[9] The upper limit of the Commission's estimate (48 cents per Mcf) was based on productivity statistics for 1971 alone. The 1971 productivity figure (379) was substantially lower than the productivity figures which the staff arrived at by its averaging methods (555--600), and it accounts almost entirely for the higher cost estimates by which the Commission was able to approve the contract rates.[10]
 
 
 15
 The Commission justifies its departure from past practice in selecting the 'test year' approach on the ground that 1971 was the year in which the wells producing the contract gas were drilled. As productivity had been generally on the decline in the years prior to 1971, the statistics for that year, the Commission argues, offered a more accurate estimate of the actual productivity of the new wells.
 
 
 16
 The superior accuracy of the 1971 figures is brought into question by evidence on the record. First, as Chairman Nassikas summarizes in dissent, '(t)he results of the wells drilled in 1971 will be reflected for the most part in reserves added in subsequent years. . . .'[11] Second, there were certain 'statistical revisions' made in 1971 which significantly affect productivity rates for that year. These were negative adjustments in the estimated reserve additions carried over from prior years, and had nothing to do with the actual experience of the industry in 1971. They resulted in a reduction of 1.1 billion Mcf. If allowance were made for this purely statistical manipulation, productivity for 1971 would approach 500 Mcf rather than the 379 Mcf relied on by the Commission.[12]
 
 
 17
 The reasonableness of the Commission's adoption of the 1971 'test year' is further undercut by evidence that the productivity of wells in the Southern Louisiana area was about 4.8 times as high as the national average in 1971.[13] Thus, in the name of 'accuracy' the Commission moved to a lower productivity rate than had been used by its staff, in the face of evidence that an even higher rate may, in fact, have been closer to reality.
 
 
 18
 The Commission is certainly free to try out new techniques, but it is constrained to show that its departures from established practice are reasonable,[14] particularly where, as here, the change is crucial to its decision.[15] It has not made that showing on the record in this case.
 
 
 19
 The Commission also points to various non-cost factors as justification for its decision. These include the contract rates, as negotiated, the prevailing intrastate rates, the cost of importing gas from other sources (e.g., Canadian gas, coal gas), and the 'commodity value of natural gas' (based on a comparison of the contract rates with the cost of 'substitutable forms of energy in sixteen areas served by Tennessee and its resale customers.'[16]). The appellants attack the Commission's reliance on these factors from a number of different directions. In light of the problems with the Commission's cost estimates, however, perhaps only two rather general points need to be made.
 
 
 20
 Even after Permian and Mobil Oil, it is doubtful that non-cost factors can sustain a decision by the FPC which is unsupported by sound cost data. In Mobil Oil, for instance, where great deference was paid to non-cost elements in upholding the Commission's decision, the Court began with the premise that '(appellant's) attack on the Commission's evidence of costs is clearly frivolous.'[17] And even if non-cost factors could, under certain circumstances, overcome problems in cost analysis of the sort apparent here, these factors are not entitled to overriding weight in the particular circumstances of this case.
 
 
 21
 Reliance on non-cost factors has been endorsed by the courts primarily in recognition of the need to stimulate new supplies of natural gas in interstate commerce.[18] Here, however, the needed supplies are assured. The gas reserves have already been discovered and tapped.[19] More importantly, as the wells are on leases in the federal domain, the gas cannot be sold at all without the Commission's approval.[20] Thus, there is no potential diversion to intrastate commerce. This is not to suggest that offshore producers, as in some sense captives of the Commission, are to be confined to the lowest rate constitutionally permissible, but their peculiar status cannot be ignored in determining what weight market factors should be accorded.
 
 
 22
 One could argue that the approval of the 45 cent rate sought by these companies would in fact augment interstate supplies by encouraging producers to tap reserves in the area on the assumption that their contracts will be accorded similar treatment. As recognized by the court's opinion in Moss v. FPC,[21] it is the purpose of section 2.75 to stimulate new production by offering relief from area rates to producers under individual contracts. At the same time, however, the court cautioned that section 2.75 could not be administered by the Commission 'to substitute contract prices negotiated between producers and pipelines for established just and reasonable rates.'[22] Therefore, the Commission cannot be taken as suggesting, by its decision in this proceeding, that contract rates in other cases will necessarily be approved. And the Commission has sought to make this clear:
 
 
 23
 In insisting that our decision here is to be read only as a decision on the applications before us, we seek to underscore the essential nature of Section 2.75 cases as proceedings which do not carry industrywide consequences. Our decision here establishes rates and conditions of service for three individual sales. It does no more.[23]
 
 
 24
 In light of the flaws in the Commission's cost analysis, and in light also of the limited relevance of supply considerations to this proceeding, we set aside the Commission's order and remand for a redetermination of the reasonableness of the contract rates.
 
 
 25
 We have reason to believe that this disposition will be welcomed by the FPC. For the Commission has abandoned the 'test year' approach in more recent cases and has relied instead on the cost findings embodied in the applicable area rate decision.[24] A remand will allow it to reach a result in this case more consistent with its recent approach and more consistent, incidentally, with the approach which it proposed in initially promulgating section 2.75.[25]
 
 On Intervenor's Petition for Rehearing
 PER CURIAM:
 
 26
 In this petition for rehearing intervenor Tenneco raises an objection to the inference that we draw from Exhibit 31, which compares offshore drilling costs and productivity with national figures.[1] The data contained in Exhibit 31, we concluded, undercut the testimony of an expert as to a general tendency in the offshore area for higher productivity to be offset or washed out by higher costs.[2] The petition suggests that our reliance on Exhibit 31 ignores higher lease acquisition costs offshore and includes as an appendix two exhibits from the record before the FPC. These exhibits, Tenneco argues, show that lease acquisition costs are far higher offshore than onshore and therefore support the FPC's conclusion of a 'wash-out.'
 
 
 27
 Neither of these exhibits (Nos. 32 and 36) are cited in the Commission's opinion[3] or in the briefs of the FPC or the intervenors on appeal. Nor were they available on appeal as part of the Designated Portions of the Record in Lieu of an Appendix. Tenneco claims they were not included because there was 'no reason to believe until the issuance of the decision that this court was going to rely so heavily on Exhibit 31.'[4] But the point which we make on the basis of Exhibit 31 was raised in the briefs of at least two petitioners,[5] and it was acknowledged in the briefs of the FPC and several of the intervenors.[6] Indeed, the FPC's brief seemed to assume its validity.[7] In any event, neither the FPC nor the intervenors objected to the point on the basis of significantly higher lease acquisition costs in the offshore area.
 
 
 28
 Federal Rule of Appellate Procedure 16(b) gives courts of appeals wide latitude in correcting omissions from the agency record under review.[8] And notwithstanding the requirements of Federal Rule of Appellate Procedure 28, regarding the contents of briefs on appeal,[9] we may also consider points not raised in the briefs or in oral argument.[10] Our willingness to do so rests on a balancing of considerations of judicial orderliness and efficiency against the need for the greatest possible accuracy in judicial decisionmaking. The latter factor is of particular weight when the decision affects the broad public interest.[11] Our resolution of this case has important implications for the price which American consumers will pay for more than 235 Bcf of natural gas produced from the federal domain in offshore Louisiana, as well as the profits which Belco, Tenneco and Texaco can expect to realize[12]. Our recognition of this dimension of the case has led us to review our holding in light of Tenneco's submissions.
 
 
 29
 We have some initial difficulty in discerning the relevance of the two exhibits on which Tenneco relies. To our untutored eyes, they reveal only the gross amounts bid for or paid by the oil companies for leases on offshore acreage. They do not offer a comparative analysis of these amounts versus amounts paid for similar acreage onshore. They do not appear, therefore, to provide direct support for Tenneco's assertion that 'offshore lease acquisition costs are far higher than onshore lease acquisition costs.'[13] We are left, as before, with the conclusory statements of an expert viewed against the warning flag raised by the data in Exhibit 31.
 
 
 30
 Taking Tenneco's contentions in a more general light, we can, of course, appreciate the possibility that higher offshore lease acquisition costs may result in a wash-out. But even if it is assumed that this is the case, Tenneco's assertions affect only one of three objections we raise to the FPC's cost findings in this case, and they do not change our assessment of the FPC's decision as resting on a bootstrap rationale, employing data selectively to reach a desired result. On the remand ordered by our decision, the FPC may wish to explore more thoroughly the actual effect of lease acquisition cost differentials on the point in question. With the full record at its disposal, and the ability to take new evidence if necessary, the Commission seems the logical forum for such an investigation.
 
 
 31
 The petition for rehearing is denied.
 
 
 
 [1]
 Moss. v. FPC, 164 U.S.App.D.C. 1, 3, 502 F.2d 461, 463 (1974)
 
 
 [2]
 164 U.S.App.D.C. 1, 502 F.2d 461 (1974)
 
 
 [3]
 FPC Opinion No. 659 (May 30, 1973), reproduced in designated portions of the record in lieu of an appendix, at 4842. (References to portions of the Commission's opinion, and the concurring and dissenting opinion of Chairman Nassikas, are hereinafter made to pages in the record.)
 
 
 [4]
 Southern Louisiana Area Rate Proceeding, 46 F.P.C. 86 (1971), aff'd sub nom. Placid Oil Co. v. FPC, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974)
 
 
 [5]
 See Permian Area Rate Cases, 390 U.S. 747, 761, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)
 
 
 [6]
 R. 4849
 
 
 [7]
 R. 4911. The companies were given the opportunity to put forth specific cost data on the producing properties involved, but no such data was produced. See Brief for Respondent Federal Power Commission at 27 n. 35
 
 
 [8]
 Moss v. FPC, supra note 2, at 466, quoting FPC Order No. 455
 
 
 [9]
 R. 4869
 
 
 [10]
 In following through with the 'test year' approach, the Commission also relied on 1971 cost data. Some elements of the 1971 figures, such as drilling costs and dry hole costs, showed increases over prior years, see R. 4873; other elements, such as the cost of producing wells, lease acquisition costs and exploratory overhead, showed decreases, see id. The net effect of the Commission's use of this data was therefore not great
 The Commission's implementation of the 'test year' approach was not complete. It relied on the cost findings contained in its Southern Louisiana area rate decision with regard to production expenses, regulatory expenses and net liquid credit. See R. 4875. The Commission cites lack of evidence for trending these costs as a justification for falling back on its Opinion 598 findings, although it does not indicate that it sought to develop such evidence on the record.
 
 
 [11]
 R. 4911
 
 
 [12]
 R. 4912. This is Chairman Nassikas' calculation. In oral argument, counsel for the FPC disputed this projection, claiming that if the negative revisions were compensated for, the result would be a productivity rate of 426, which would still be sufficient to justify the 45cents rate on a cost basis
 
 
 [13]
 Exhibit No. 31, R. 3560--61
 The Commission's brief on appeal acknowledges the higher productivity of offshore wells but suggests at the same time that this higher productivity is offset by the higher costs of offshore drilling, which in 1971 averaged 2.5 times more than the costs of onshore drilling. Id. Although testimony on the record cites a 'general offsetting effect,' R. 1771, it does not support the Commission's assertion that one factor effectively cancels the other. By simple arithmetic calculation, the return on a dollar spent in 1971 in the offshore area exceeded return on the same dollar spent onshore by a factor of nearly two, if the statistics of Exhibit No. 31 are accepted.
 
 
 [14]
 Cf. City of Detroit v. FPC, 97 U.S.App.D.C. 260, 268, 230 F.2d 810, 818 (1955), cert. denied, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956) ('if the Commission is now to abandon the treatment historically accorded pipeline-produced gas in rate making on the ground that the ultimate public interest will be better served thereby, the Commission should justify it on the record.')
 
 
 [15]
 See Permian Area Rate Cases, supra note 5, 390 U.S. at 790--792, 88 S.Ct. at 1372--1373
 
 
 [16]
 R. 4881
 
 
 [17]
 Mobil Oil Corp. v. FPC, 417 U.S. 283, 314, 94 S.Ct. 2328, 2349 (1974)
 
 
 [18]
 See, e.g., id. at 314--321, 94 S.Ct. at 2349--2352
 
 
 [19]
 In this respect, section 2.75 proceedings will all be similar, and distinguishable from area rate proceedings, in which the Commission's order applies not only to flowing gas but to gas which has yet to be introduced into the market
 
 
 [20]
 R. 4917
 
 
 [21]
 164 U.S.App.D.C. at 3--5, 502 F.2d at 463--465
 
 
 [22]
 Id. at 4, 502 F.2d at 464
 
 
 [23]
 R. 4850
 
 
 [24]
 See, e.g., In re Stingray Pipeline Company, Docket No. CP 73--27 (FPC May 26, 1974)
 
 
 [25]
 We will, absent a showing of special circumstances, accept as conclusive the cost findings embodied in our area rate decisions, as such may be supplemented from time to time by appropriate Commission order
 C Order No. 455 (Aug. 3, 1973) (emphasis added). As mentioned, see note 7 supra, there was no 'special circumstances' asserted by the companies in this case that would have justified a departure from the cost findings on which the Commission's Southern Louisiana area rates are based.
 
 
 [1]
 166 U.S.App.D.C., at ---, 510 F.2d at 660, n. 13
 
 
 [2]
 R. 1777
 
 
 [3]
 The Commission does make reference to 'the escalating costs of acquiring leases in the offshore area' as justification for adding 1.67 cents to the staff's estimate of 36.58 cents per Mcf in arriving at the lower range of its cost estimate. R. 4869 n. 42. But it makes no reference to evidence demonstrating this ecalation, or indicating substantial differentials between offshore and onshore lease acquisition costs
 The Commission does not mention Exhibit 31, nor does it seek to give counterbalancing effect to the higher offshore productivity reflected in that document.
 
 
 [4]
 Petition for Rehearing, 166 U.S.App.D.C. at ---, 510 F.2d at 662--663
 
 
 [5]
 Brief of American Public Gas Ass'n at 51--52; Brief of Public Service Comm'n of N.Y. at 27
 
 
 [6]
 Brief for the FPC at 26; Brief of Tenneco Oil Co. at 16 n. 32; Brief of Belco Petroleum Co. at 16 n. 31. The briefs for Texaco and Tennessee Pipeline do not appear to address the point
 
 
 [7]
 (W)hile it is true that there is evidence in the record which estimated that costs in the offshore area was approximately twice onshore costs and offshore productivity was approximately 4.8 times that of onshore, there is other evidence showing that these off-set each other so that the net effect is a wash
 Brief for the FPC at 26 (citations omitted).
 
 
 [8]
 This rule seems designed to reverse the strict policy with regard to omissions reflected in cases such as NLRB v. Knight Morley, Inc., 251 F.2d 753 (6th Cir. 1958) (denying rehearing on the strength of an exception not included in the trial examiner's report); Bowdidge v. Lehman, 252 F.2d 366 (6th Cir. 1958) (refusing to hear argument on admissibility, validity and effect of evidence not quoted in appellant's appendix). See also Fed.R.App.P. 17(b) & Advisory Comm. Note, subdivision (b)
 
 
 [9]
 Rule 28 has been read generally as foreclosing consideration of issues not raised in briefs filed by appellants and appellees. See Mississippi River Corporation v. FTC, 454 F.2d 1083 (8th Cir. 1972); United States v. White, 454 F.2d 435 (7th Cir. 1971), cert. denied, 406 U.S. 962, 92 S.Ct. 2070, 32 L.Ed.2d 350 (1972); Pedicord v. Swenson, 431 F.2d 92 (8th Cir. 1970)
 
 
 [10]
 The foreclosure rule referred to in note 9 supra has been relaxed in cases where substantial public interests were involved, e.g., Platis v. United States, 409 F.2d 1009 (10th Cir. 1969), or the operation of the rule appeared 'unduly harsh,' e.g., Gebhard v. SS Hawaiian Legislator, 425 F.2d 1303 (9th Cir. 1970)
 
 
 [11]
 See, e.g., Platis v. United States, supra note 10
 
 
 [12]
 These profits in turn are expected to stimulate greater offshore exploration
 
 
 [13]
 Petition for Rehearing, 166 U.S.App.D.C. at ---, 510 F.2d at 662